[Cite as *State v. Perkins* , 2014-Ohio-752.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                    CASE NO.  5-13-01

      v.

CORY A. PERKINS,                         O P I N I O N

      DEFENDANT-APPELLANT.


**Appeal from Hancock County Common Pleas Court**
**Trial Court No. 2012 CR 27**

**Judgment Affirmed**

**Date of Decision:   March 3, 2014**


APPEARANCES:

    *Deborah Kovac Rump* **for Appellant**

    *Mark C. Miller and Elizabeth H. Smith*  **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant Cory A. Perkins ("Perkins") appeals the January 11, 2013, judgment of the Hancock County Common Pleas Court sentencing Perkins to an aggregate prison term of 21 years following a jury trial wherein Perkins was convicted of three counts of Rape in violation of R.C. 2907.02(A)(2), all felonies of the first degree.

{¶2} The facts relevant to this appeal are as follows. On February 7, 2012, Perkins was indicted for three counts of Rape in violation of R.C. 2907.02(A)(2). (Doc. 1).

{¶3} On February 9, 2012, Perkins was arraigned and pled not guilty to the charges. (Doc. 6).

{¶4} On August 2, 2012, the State filed a motion in limine seeking to exclude evidence of the victim's prior sexual activity. (Doc. 48).

{¶5} On August 3, 2012, the State filed a notice of intention to use other acts evidence. (Doc. 49). The motion indicated that the State would introduce evidence that Perkins was out "on bond" on another criminal offense for the purpose of establishing Perkins' identity, as it was one of only a few pieces of information that the victim could recall about Perkins. (*Id.*)

{¶6} On October 1, 2012, a hearing was held on the State's motion in limine and on the State's notification of intention to use other acts evidence. At

the hearing, the parties stipulated that no evidence of the victim's sexual history would be introduced at the trial. (Doc. 86). After hearing the parties' arguments regarding "other acts" testimony, the court determined that the "other acts" testimony concerning Perkins' bond status would be admissible for the limited purpose of establishing Perkins' identity and that any prior criminal offense should not be mentioned. (*Id.*) The court stated that its determination was subject to further ruling on any objections raised at trial. (*Id.*)

{¶7} On October 22-25, 2012, a jury trial was held. At the trial, the State called seven witnesses, beginning with Angelica Sayarath ("Sayarath"). Sayarath testified that on the night of August 12, 2011, she went to the Walnut Saloon in Findlay, Ohio, with her friend Kyle Sayler. (Tr. at 263). There, she observed the victim in this case (hereinafter referred to as "Kelsie") having a drink with her friend Desta. (*Id*. at 264). The four females ended up congregating at a table along with two men whom none of the girls knew, later identified as Perkins and Perkins' brother Joel. (*Id*. at 268-69). Sayarath testified that Perkins bought a round of shots for everyone at the table but Sayarath, as Sayarath was driving and not drinking. (*Id*. at 272).

{¶8} Sayarath testified that the group of six stayed at that table for the evening. (*Id*. at 270). Sayarath testified that as she initially conversed with Kelsie, Sayarath did not think Kelsie was intoxicated. (*Id*. at 274). At some point

during their conversation, Kelsie asked Sayarath to accompany her to the bathroom, and Sayarath did so. (*Id*. at 274-275). According to Sayarath, about 15 minutes after that first trip to the bathroom, Kelsie again asked Sayarath to accompany her to the bathroom, and Sayarath did so for a second time. (*Id*.) During the second trip to the bathroom, Sayarath testified that Kelsie's demeanor changed and that Kelsie could hardly walk. (*Id*. at 276). Sayarath testified that Kelsie almost fell over coming out of the bathroom stall. (*Id*.)

{¶9} Sayarath testified that back at the table where their group was gathered, Kelsie kept leaning away from Perkins when Perkins talked to Kelsie, causing Kelsie to bump into Sayarath multiple times as Sayarath was seated on Kelsie's other side. (*Id*. at 277). Sayarath testified that Perkins mentioned at one point during the night that he was on "felony probation." (Tr. at 274).

{¶10} Sayarath testified that around 1:00-1:30 a.m. she was ready to leave the bar. (*Id*. at 282). When Sayarath left, she took Kyle and Desta with her to drop them off. (*Id*.) Sayarath testified that although it concerned her leaving Kelsie at the bar, and that the whole situation didn't "feel right," Kelsie had told Sayarath that she had money for a cab and was going to stay, so Sayarath left without her. (Tr. at 278-279).

{¶11} The State next called Kelsie, and Kelsie corroborated Sayarath's version of events at the bar. Kelsie testified that she did not recall when Desta,

Sayarath, and Kyle left. (Tr. at 309). Kelsie testified that the last thing she remembered from the bar was dancing with some girls when a song she liked came on. (*Id.*) Kelsie testified that the next thing she knew she was being pulled out of Perkins' vehicle by her hair into a field. (*Id.*) The first thing she remembered Perkins saying to her in the field was that he was going to "put it in her butt." (*Id.* at 310).

{¶12} Kelsie testified that Perkins then forced her to the ground, and inserted his penis into her anal cavity. (Tr. at 311). Kelsie testified that it hurt and she tried to fight back. (*Id.*) Kelsie testified that she hit Perkins in the face area and that Perkins hit her back. (*Id.*) Kelsie also testified she was scared and asked him to stop. (*Id.* at 312). She testified that she screamed for help. (*Id.*)

{¶13} Kelsie testified that Perkins then forced his penis into her vagina. (*Id.* at 313). Kelsie testified that she didn't fight back much or say much after he had hit her. (*Id.*) Kelsie testified that at some point Perkins slammed her head into the tire of his vehicle and then forced his penis into her mouth with such force that she could not breathe. (*Id.*) Kelsie also testified that Perkins smacked her in the face multiple times with his penis across her cheeks, and that it humiliated her. (*Id.* at 315). According to Kelsie, Perkins said he could kill her and leave her there because no one knew that she was there. (*Id.* at 314).

{¶14} Kelsie testified that after the incident she got back in the vehicle and was crying. (Tr. at 314). She testified that Perkins then drove her back to her trailer park at Riverview Terrace. (*Id*. at 315). According to Kelsie, the drive from the field to Riverview Terrace where she lived only took "[j]ust a couple minutes." (*Id*. at 316). Kelsie testified that when they arrived in the trailer park, Perkins pushed her out of the vehicle. (*Id*.) Kelsie testified that she was so disoriented she did not know where she was, so she had to call her husband's friend John to come get her. (*Id*.) Kelsie's husband, David, was hanging out with John at their trailer, and Kelsie could not call David directly because David's phone had been disconnected. (*Id*. at 317).

{¶15} John testified that when he received the call, he and David were still awake. (Tr. at 413). John testified that he put David on the phone immediately. (Tr. at 414). David testified that Kelsie was hysterical and that Kelsie told him she was in the trailer park and did not know where she was. (Tr. at 386-87). David testified that he directed her to walk to the nearest street sign. (*Id*.) It turned out Kelsie was on their street, just further up the road. (*Id*. at 387). David and John then drove down and picked up Kelsie. (*Id*.) David and John testified Kelsie was hysterical and dirty and that they had to help her into the vehicle. (*Id*.)

{¶16} Once back at the residence, David testified that Kelsie continued to be hysterical and that he could hardly understand what she was trying to tell him.

(Tr. at 389). Kelsie testified that only the kitchen light was on at the residence as the children were asleep. (Tr. at 318). David testified that they did not turn on more lights in the house so as to not wake the children. (*Id*.) David testified that Kelsie told him she had been raped, but he could hardly understand her, so he did not call the police right then. (Tr. at 389). Kelsie repeatedly complained to David that her butt hurt so bad that she thought something was wrong, so she asked her husband to look at it. (Tr. at 318). David, not understanding her, did not do so. Kelsie ended up going back into the bedroom and going to sleep. (Tr. at 318). David and John slept in the living room on separate couches. (*Id*.) David and Kelsie testified that David regularly slept on the couch due to Kelsie's "snoring." (*Id*.)

{¶17} After sleeping for several hours, Kelsie woke David up to show him her bruises in the light of day. (Tr. at 320). David testified that when he saw his wife's injuries he knew something had happened. (Tr. at 389-90). David also had found a piece of straw in Kelsie's hair, which he threw in the trash. (Tr. at 320); (Tr. at 393). Kelsie informed David about the rape, and David suggested that they call the police. (Tr. at 393). Kelsie, David, and John's stories regarding what happened once Kelsie called John's phone in the trailer park through the next morning were all consistent.

{¶18} Deputy Lyle Harvitt responded to Kelsie and David's residence and spoke with Kelsie out of the presence of her husband. (Tr. at 544-545). Kelsie told Deputy Harvitt her version of events. (Tr. at 545). Deputy Harvitt noted that Kelsie had some dirt and grass stains on the pants she had been wearing the night before, as well as some dirt, pieces of grass, and dried mud on the shirt she had been wearing. (Tr. at 552). Deputy Harvitt testified that he collected the piece of straw that David had taken out of Kelsie's hair. (Tr. at 552-53). Deputy Harvitt asked Kelsie who had assaulted her, and Kelsie relayed to him all that she could remember. Kelsie recalled that her assailant's first name was Cory, and that Cory had told her he was out on bond on a criminal charge. (Tr. at 546). Kelsie also recalled the first name of Cory's probation officer and the name of his attorney. (*Id*.) After collecting this information, Deputy Harvitt had Kelsie go to Toledo Hospital to see a Sexual Assault Nurse Examiner ("SANE").

{¶19} At the hospital, Kelsie was examined by Katie Bush, a SANE. Bush testified that there were over two dozen visible injuries to Kelsie.[1] (Tr. at 478). The injuries ranged from head to toe, including two genital injuries, a knocked-out filling in Kelsie's mouth, a large bruise on Kelsie's face, and bruises and scratching on Kelsie's back and legs. (*Id*.) Bush noted that Kelsie's thigh bruising could be indicative of someone forcing her legs open, and that the thigh bruising

---

[1] Specifically, Bush identified 26 visible injuries to Kelsie. (Tr. at 478).

was consistent with Kelsie's story. (Tr. at 495). Bush also noted that some of the bruises indicated the use of a significant amount of force. (Tr. at 491).

{¶20} Deputy Harvitt testified that he eventually learned the person Kelsie described to him was Cory Perkins. (Tr. at 565). Through her own independent investigation over the internet, Kelsie found her assailant, and identified him as Perkins as well. (*Id.*) DNA evidence taken by Bush during Kelsie's examination was later returned, confirming the presence of Perkins' semen in Kelsie's vagina. (Tr. at 584).

{¶21} At the conclusion of the State's case, Perkins called three witnesses on his behalf. Perkins first called his brother Joel, who had been at the bar with Perkins on the evening/early morning of the incident. Joel testified at the trial that when they left the bar that night, Perkins dropped him off. (Tr. at 626). Joel testified that Kelsie invited herself to get a ride home. (*Id.*) Through cross-examination it was revealed that Joel had an extensive criminal history and was a convicted sex offender. (Tr. at 629).

{¶22} Perkins' mother then testified at the trial. She testified that Perkins came home in the early morning hours on the date of the alleged incident with Kelsie and that the two subsequently left together. (Tr. at 647).

{¶23} Breann[2] Perkins also testified at the trial. Breann had been married to Perkins but the two were separated. Breann testified that Perkins had a heart attack at 24, and that the heart condition prevented him from engaging in physical activities. (Tr. at 678-680).

{¶24} Once the preceding testimony was presented, the parties presented closing arguments and the case was submitted to the jury. After deliberating, the jury found Perkins guilty of all three counts of Rape. The trial court ordered a pre-sentence investigation and set the matter for sentencing.

{¶25} On January 3, 2013, the court held a sentencing hearing. Perkins was sentenced to 7 years in prison on each count of Rape, to be served consecutively, for an aggregate prison term of 21 years. An entry reflecting Perkins' sentence was filed January 13, 2013. (Doc. 110).

{¶26} It is from this judgment that Perkins appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**PERKINS' RIGHT TO REMAIN SILENT AND BE REPRESENTED BY COUNSEL AS GUARANTEED BY THE CONSTITUTION WAS VIOLATED WHEN THE STATE'S LAW ENFORCEMENT WITNESS REPEATEDLY TESTIFIED THAT PERKINS INVOKED THOSE RIGHTS AFTER BEING MIRANDIZED DURING A CUSTODIAL INTERVIEW. HIS RIGHT TO DUE PROCESS WAS LIKEWISE VIOLATED BY THIS DISCLOSURE.**

---

[2] Appellant's Brief cites his estranged wife's name as "Breanna." The State names her "Breanne" in its brief. The transcript, which does not include the spelling of her name, cites it as "Breann" and that is the spelling we will use herein. (Tr. at 675).

**ASSIGNMENT OF ERROR 2**
THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING THE STATE'S MOTION TO USE EVID.R. 404(b) EVIDENCE. SPECIFICALLY, THAT THE JURY WAS PERMITTED TO REPEATEDLY BE ADVISED THAT PERKINS WAS ON BOND FOR ANOTHER CRIMINAL CASE WHEN THE EVENTS CHARGED IN THIS CASE OCCURRED. THE BOND WAS FOR A BURGLARY CASE, AND WAS SUPPOSED TO BE USED FOR IDENTITY EVEN THOUGH IDENTITY WAS NOT IN ISSUE. FURTHER, THE JURY WAS INCORRECTLY TOLD PERKINS HAD PRIOR CONVICTIONS AND WAS ON PROBATION.

**ASSIGNMENT OF ERROR 3**
THE STATE FAILED TO PROVE VENUE, WHICH IS A CRITICAL EVIDENTIARY REQUIREMENT. PERKINS' CONVICTIONS WERE LEGALLY BASED UPON INSUFFICIENT EVIDENCE AND HIS RULE 29 MOTION SHOULD HAVE BEEN GRANTED.

**ASSIGNMENT OF ERROR 4**
THE TRIAL COURT ABUSED ITS DISCRETION BY IMPROPERLY APPLYING THE RAPE SHIELD LAW TO PREVENT PERKINS FROM OFFERING MEDICAL EVIDENCE THAT HIS SERIOUS HEART CONDITION GREATLY LIMITS HIS ABILITY TO ENGAGE IN THE PHYSICAL ACTIVITIES ALLEGED.

**ASSIGNMENT OF ERROR 5**
PERKINS' TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE UNITED STATES CONSTITUTION, SIXTH AMENDMENT.

**ASSIGNMENT OF ERROR 6**
THE PROSECUTOR ENGAGED IN PERSISTENT, PERVASIVE AND INTENTIONAL MISCONDUCT, OFTEN TAKING ADVANTAGE OF PERKINS' INEFFECTIVE COUNSEL BY TESTIFYING TO THE JURY AND USING EXTRINSIC HEARSAY CHARACTER EVIDENCE TO

**IMPEACH PERKINS EVEN THOUGH HE DID NOT TESTIFY.**

{¶27} For the sake of clarity, we elect to address some of the assignments of error out of the order in which they were raised.

*Third Assignment of Error*

{¶28} In Perkins' third assignment of error, Perkins argues that there was insufficient evidence to convict him and that his Crim.R. 29 motion for acquittal should have been granted. Specifically, Perkins contends that the State failed to prove "venue."[3]

{¶29} Crim.R. 29(A) provides that a court must order the entry of a judgment of acquittal of a charged offense "if the evidence is insufficient to sustain a conviction of such offense[.]" However, "a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman,* 55 Ohio St.2d 261 (1978), syllabus. Thus, a motion for acquittal tests the sufficiency of the evidence. *State v. Tatum,* 3d Dist. Seneca No. 13–10–18, 2011–Ohio–3005, ¶ 43, citing *State v. Miley,* 114 Ohio App.3d 738, 742 (4th Dist.1996).

{¶30} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to

---

[3] Perkins does not argue that there was insufficient evidence to convict him regarding any of the other elements in his crime.

-12-

the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe,* 105 Ohio St.3d 384, 2005–Ohio–2282, ¶ 47, citing *State v. Jenks,* 61 Ohio St.3d 259 (1991), superseded by state constitutional amendment on other grounds as stated in *State v. Smith,* 80 Ohio St.3d 89 (1997). Sufficiency is a test of adequacy, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

**{¶31}** In a criminal case, venue is not a material element, but the State must still prove venue beyond a reasonable doubt. *State v. Headley*, 6 Ohio St.3d 475, 477 (1983). "Venue is satisfied where there is a sufficient nexus between the defendant and the county of the trial." *State v. Chintalapalli*, 88 Ohio St.3d 43, 45 (2000). Venue need not be proven in express terms. *Id.* Rather, it can be established by all of the facts and circumstances viewed in the light most favorable to the state. *Id.* In addition, it has been stated that a trial court has broad discretion to determine the facts which would establish venue. *See, e.g., State v. Mills,* 6th Dist. Williams No. WM–09–014, 2010-Ohio-4705, ¶ 22.

**{¶32}** R.C. 2901.12 governs venue, and reads, in pertinent part,

**(A) The trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed.**

\* \* \*

**(G)  When it appears beyond a reasonable doubt that an offense or any element of an offense was committed in any of two or more jurisdictions, but it cannot reasonably be determined in which jurisdiction the offense or element was committed, the offender may be tried in any of those jurisdictions.**

{¶33} In this case, Perkins contends that the State failed to prove venue as Kelsie was unable to identify where the rapes took place, and Deputy Harvitt never learned the location where the rapes took place.  Perkins contends that there was a significant time gap between when Kelsie and Perkins left the bar and when Kelsie made the phone call to her husband's friend in the trailer park.  Perkins argues that during this time gap, they could have left Hancock County or even the state of Ohio.

{¶34} In *State v. Stemm*, 3d Dist. Union Co. No. 14-08-44, 2009-Ohio-1655, we addressed a similar situation where a victim did not remember leaving a bar with a defendant and could not identify the location of the crime.  *Stemm* at ¶ 25.  Citing an analogous case from the Twelfth District favorably,[4] we found that

> **although the episode began and ended in Union County, it was uncertain whether the location where the offenses took place was in Union County or one of the several adjacent counties twenty or twenty-five minutes from Marysville.  Despite this uncertainty, we find that proof existed beyond a reasonable doubt that the offenses occurred in Union County or one of the adjacent counties, establishing jurisdiction in Union County pursuant to R.C. 2901.12(G).**

---

[4] *State v. Miller*, 63 Ohio App.3d 479 (12th Dist.1989).

-14-

*Id.*

**{¶35}** The facts in this case are similar to *Stemm*, in that Kelsie met Perkins in a bar called the Walnut Saloon in Hancock County. Kelsie was returned after the incident to her residence in Hancock County. While it is uncertain where the incidences of rape actually took place, pursuant to our prior case law, R.C. 2901.12(G) would make venue proper in Hancock County.

**{¶36}** However, even if R.C. 2901.12(G) was not applicable to this case, we would also find based on the facts that there was sufficient evidence for a juror to determine beyond a reasonable doubt that the incident did, in fact, take place in Hancock County based on Kelsie's testimony and the testimony of Deputy Harvitt. Kelsie testified that the drive from the field where she was raped to her trailer park lasted "[j]ust a couple minutes." (Tr. at 316). Deputy Harvitt testified that although he did not identify the field where Kelsie was raped, there were fields both near Kelsie's trailer park, and within a quarter mile of Perkins' residence, which was in Hancock County. Based on this testimony, a juror could infer that the rape took place within a very short distance from Kelsie's trailer park, being that it was such a short drive, making venue proper in Hancock County.

**{¶37}** Thus for either or both of these reasons, Perkins' third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶38}** In Perkins' fourth assignment of error, Perkins argues that the trial court abused its discretion by not permitting Perkins to offer evidence that his heart condition restricted his sexual activities. Specifically, Perkins contends that the trial court erred by excluding testimony of Perkins' estranged wife that Perkins was limited in the sexual positions he could perform.

**{¶39}** Prior to Breann Perkins testifying on Perkins' behalf, the court convened outside of the jury's presence. Perkins' counsel then stated the following:

> **MR. CALLEJAS: Your Honor, part of the testimony that Mrs. Perkins will be testifying to is the sexual activity between her and the Defendant, Cory Perkins, my client, Your Honor. Some of that testimony would include the type of actual sexual activity that was – that was normal during the course of their marriage, including, Your Honor, the positions of – the sexual positions that they entertained while having sex as a result of Cory's medical condition, Your Honor. Which effects – prevents him from doing certain types of serious physical activities, including the normal act of sex, Your Honor.**
>
> **It's my understanding from our preliminary suggestions [sic] that the Court felt that the rape shield statute would be appropriate in this matter. I would advise the Court that I felt – for the purposes of the record, that I thought that this testimony was important. That it was more important than the State's interest in preventing testimony regarding sexual activity of the Defendant, and that his right – his constitutional rights to bring evidence before the Court would be prohibited by the Court ruling that the State – the Rape Shield Statute apply in this matter.**

Case No. 5-13-01

(Tr. at 669-670).

**{¶40}** In response to counsel's argument, the trial court analyzed the Rape Shield Law, turning to R.C. 2907.02(D) for instruction as to what testimony was permissible. It reads, in part,

**(D)** * * *

**Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section *unless* it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.**

(Emphasis added.) R.C. 2907.02(D).

**{¶41}** After reviewing this section of the Revised Code, the trial court reasoned that the stated purpose of Breann's testimony did not fall under any of the exceptions in R.C. 2907.02(D), and thus the court found that the testimony was not admissible. (Tr. at 672).

**{¶42}** Following this discussion and the trial court's ruling, Breann Perkins took the stand and testified that Perkins had a major heart attack at 24, that Perkins took medication for his heart condition, and that his heart condition prevented him from engaging in certain physical activities. (Tr. at 679-680).

-17-

{¶43} On appeal, Perkins contends that the trial court improperly prevented Breann Perkins from testifying that Perkins' heart condition "limited his ability to engage in sexual positions other than traditional vaginal sex, and overall limited his ability to perform sexually." (Appt's Br. at 25).

{¶44} At the outset we would note that the proffered testimony would appear to be inconsistent with Perkins' defense that the sexual conduct alleged by Kelsie was consensual. For this reason alone, we believe the trial court's decision to exclude this testimony would not constitute an abuse of discretion.

{¶45} In addition, we note that the jury did get to hear testimony that Perkins had a heart condition as well as testimony that Perkins was precluded from engaging in certain "physical acts." From this testimony, the jury could have inferred the excluded testimony of Breann and thus any error in failing to construe the testimony as evidence of "disease" within the exceptions to R.C. 2907.02(D)— particularly in the absence of any medical testimony—is rendered harmless in our view.

{¶46} Accordingly, for the foregoing reasons we do not find that the trial court erred in excluding Breann's testimony under R.C. 2907.02(D). Therefore, Perkins' fourth assignment of error is overruled.

*First Assignment of Error*

**{¶47}** In Perkins' first assignment of error, Perkins contends that his right to remain silent was violated when Deputy Harvitt testified that Perkins invoked his Miranda rights and chose to remain silent during Harvitt's interview of Perkins.

**{¶48}** At the outset, we would note that Perkins' counsel did not object to this issue at trial, and we therefore review it under a plain error standard. In order to have plain error under Crim.R. 52(B) there must be an error, the error must be an "obvious" defect in the trial proceedings, and the error must have affected "substantial rights." *State v. Barnes,* 94 Ohio St.3d 21, 27, (2002). Plain error is to be used "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.* quoting *State v. Long,* 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**{¶49}** Evidence submitted by the State regarding a defendant's exercise of his right to remain silent during an interrogation violates the Due Process Clause of both the state and federal constitutions. *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240 (1976); *State v. Leach,* 102 Ohio St.3d 135, 2004-Ohio-2147, ¶ 18. "A defendant's decision to exercise his right to remain silent during police interrogation is generally inadmissible at trial either for purposes of impeachment

or as substantive evidence of guilt." *State v. Perez,* 3d Dist. Defiance No. 4-03-49, 2004-Ohio-4007, ¶ 10, citing *Leach.*

**{¶50}** Use of a defendant's silence in the State's case-in-chief puts a defendant in the position of having to choose between allowing a jury to infer guilt from his silence or being forced to take the stand to explain his prior silence, thereby surrendering his right not to testify. *Perez,* 2004-Ohio-4007, at ¶ 20. Nevertheless, the introduction of evidence regarding a defendant's decision to remain silent does not constitute reversible error if, based on the whole record, the evidence was harmless beyond any reasonable doubt. *State v. Zimmerman*, 18 Ohio St.3d 43, 45, (1985). The Ohio Supreme Court has held that "[a] single comment by a police officer as to a suspect's silence without any suggestion that the jury infer guilt from the silence constitutes harmless error." *State v. Treesh,* 90 Ohio St.3d 460, 480, 2001-Ohio-4; *State v. Roby*, 3d Dist. Putnam No. 12-09-09, 2010-Ohio-1498, ¶ 14.

**{¶51}** On appeal, Perkins argues that his rights were violated during the following portion of the State's direct examination of Deputy Harvitt:

> **Q[Prosecutor]: So as part of your meeting you advised him of his Constitutional Rights?**
>
> **A[Deputy Harvitt]: Yes**
>
> **Q: Where did you meet with Cory?**
>
> **A: Interview room at the Sheriff's Office.**

**Q:  I believe that was January 3ʳᵈ?**

**A:  Yes.**

**Q:  What did he tell you had occurred on the night of this incident?**

**A:  After I read him his Rights and he agreed to speak with me, he told me during that meeting that he had met up with Kelsie. And then he mentioned something about a friend of Kelsie's. Then I asked him where it was at, and he said he was at home. At his home.  I asked where that at [sic].  He gave me that address on Township Road 67.  I further questioned him and he corrected me and said, no he was only with Kelsie at that home.**

**Q: Did he say whether anyone else was there, or was just [sic] he and Kelsie?**

**A:  Way I understood it was just he and Kelsie according to the last statement that he made to me that referenced that.**

**Q:  Did you ask him what occurred between he and Kelsie?**

**A:  At that point I had started back and asked if he was at the Walnut Saloon that night.  And he said he was.  That's where I met Kelsie.  At that point he made a decision he wanted to talk to a lawyer.**

**Q:  Did you ask him specifically to explain what happened that night?**

**A:  I did.  I did.**

**Q:  What was his response to that specific question?**

**A:  I can't do that.**

**Q:  He stated I can't do that?**

**A: Yes.**

**Q: Then when you asked him with regard to the Walnut Saloon did he provide you with information about that?**

**A: That's when he did say he had met Kelsie there. And then he decided he wanted to talk to an attorney.**

**Q: Did he then leave the Sheriff's Office?**

**A: Yes. I walked him out of the interview room and into the lobby.**

(Tr. at 577-578).

{¶52} This is the only instance of Perkins' invoking his *Miranda* rights referenced by Perkins on appeal, and the only testimony elicited by the State on this matter. As such, this was an isolated mention by the State of Perkins invoking his *Miranda* rights, and only made in the context of explaining why police questioning was stopped. As in *State v. Welch*, 3d Dist. Wyandot No. 16-06-02, 2006-Ohio-6684, ¶ 13, an isolated incident will ordinarily not rise to the level of reversible error. *See also State v. Treesh,* 90 Ohio St.3d 460, 480, 2001-Ohio-4; *State v. Roby*, 3d Dist. Putnam No. 12-09-09, 2010-Ohio-1498, ¶ 14. We believe this to be especially true, where, as here, Perkins had initially waived his right to remain silent and voluntarily gave a partial statement before then electing not to continue.

{¶53} Additionally, we note that the trial court gave a limiting instruction on Perkins' silence, stating, "[i]t is not necessary that the Defendant take the

witness stand in his own defense. He has a constitutional right not to testify. The fact that he did not testified [sic] must not be considered for any purpose." (Tr. at 734). The jury is presumed to follow that instruction, diminishing any claim of prejudice to Perkins. *State v. Blevins*, 36 Ohio App.3d 147, 150, (10th Dist.1987), citing *Lakeside v. Oregon*, 435 U.S. 333, 340, 98 S.Ct. 1091, 1095 (1978). Similarly, we note that Perkins' defense counsel also reinforced the same point in his cross examination of Deputy Harvitt.

> **Q[Perkins' Counsel]: Now you said that Mr. Perkins at one point called your office, is that correct?**
>
> **A[Deputy Harvitt]: Yes.**
>
> **Q: And that at some point you met with him?**
>
> **A: Yes.**
>
> **Q: And that he explained to you why you weren't able to get ahold of him, is that correct?**
>
> **A: Yes.**
>
> **Q: Then when he – you met with him at some point he exercised his right to maintain his silence, is that correct?**
>
> **A: Yes, requested to talk to an attorney, yes.**
>
> **Q: You certainly didn't have a problem with that, did you?**
>
> **A: No.**
>
> **\* \* \***

**Q: And it's certainly not a crime to exercise your Constitutional Rights, correct?**

**A: That's correct.**

**Q: As a matter [of] fact, that's why you gave him a sheet so that he had that available to him, is that correct?**

**A: That's correct, yes.**

(Tr. at 602-603).

**{¶54}** Finally, "[w]here constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281 (1983); *State v. Risner*, 3d Dist. Logan No. 8-12-02, 2012-Ohio-5954, ¶ 56. Here, Kelsie had 26 separate injuries documented which corroborated her version of events from bruising on her thighs, to her face, to her genitals. In addition, her clothes were dirty and muddy and straw was found in her hair, contradicting Perkins' contention that he took her to his home to engage in consensual sex. In light of this overwhelming evidence, Perkins is unable to establish that even if there was error here, it was anything other than harmless error. Accordingly, Perkins' first assignment of error is overruled.

*Second Assignment of Error*

**{¶55}** In Perkins' second assignment of error, Perkins argues that "other acts" testimony regarding him being "out on bond" was not related to the criminal

charges against him in this trial and was therefore highly prejudicial. Evid.R. 404(B). Specifically, Perkins contends that "identity" was not a material issue at the trial and therefore "other acts" testimony should have been excluded.

**{¶56}** Prior to the trial, the State filed a notice of intention to use "other acts" evidence. The court held a hearing on this matter along with the State's motion in limine on October 1, 2012. At that hearing, the prosecutor stated that he intended to introduce testimony that Perkins had told Kelsie and Sayarath at the bar that Perkins was "out on bond" for another criminal offense. The State also intended to elicit testimony that Perkins named his "probation officer"[5] at the bar, and that Perkins also named his attorney. The State contended that this evidence was necessary as it was part of how Perkins was ultimately identified by Kelsie and by Deputy Harvitt.

**{¶57}** Perkins' trial counsel objected to the use of this evidence at the hearing, and contended that it would be highly prejudicial. The trial court held that it would be admissible for the limited purpose of establishing identity, but the crime for which Perkins was "out on bond" should not be mentioned. In addition, the trial court stated that its determination was subject to further ruling at trial

**{¶58}** At the trial, Perkins' bond status came up multiple times. It first came up in opening statements when the prosecutor stated,

---

[5] Apparently, as was discussed at oral argument, Hancock County's probation department also handles their "bond" issues.

> **Two men started talking to the ladies and eventually conversation turned around the fact that Kelsie was studying some criminal justice at Owens. So the Defendant told her how long he was on probation, and she thought that was strange that he would be in a bar if he was on probation. But it was part of what she remembered about that night**.

(Tr. at 249). Later in opening statements, the prosecutor added,

> **Kelsie was able to remember that she was with a guy named Cory. That he was on probation. She was also able to tell Detective Harvitt that he was on probation with the Probation Officer named Chad. That his attorney in this case was Ken Sass. Those are names that Detective Harvitt recognized.**

(Tr. at 252).

{¶59} Perkins' bond status first came up during trial testimony in the context of Sayarath's testimony. When Sayarath was on the stand, the following testimony was elicited.

> **Q [Prosecutor]: What was some of the discussion that took place at the table, if you recall?**
>
> **A [Sayarath]: There wasn't too much that I specifically remember, other than I remember it being brought up that Cory was on felony probation for something. And I do remember looking at him and asking him, well why are you here?**
>
> **Q: Who brought that up?**
>
> **A: I don't remember. It was just in topic of conversation I happen[ed] to overhear.**
>
> **Q: In response you did specifically ask Cory about it, is that correct?**
>
> **A: Yes.**

-26-

**Q: Do you remember Cory making any other statements on that night?**

**A: Not specifically, no.**

(Tr. at 273-274).

{¶60} Perkins' status next came up during Kelsie's testimony. Kelsie

testified to the following.

**Q [Prosecutor]: What did you and the people sitting at the table talk about that evening?**

**A [Kelsie]: We talked about a lot of different things. I talked about the fact – at the time I was in school getting my associates degree in criminal justice.**

**Q: Did the males talk to you about anything?**

**A: Yes.**

**Q: What did they talk to you about?**

**A: The one male, Joel, talked about his job, what he did for a living. Cory was talking about some trouble that he was in.**

**Q: Okay. Did he state anything specific about the trouble?**

**A: Yeah. What the charge was. Who his bond officer was and who his lawyer was.**

**Q: Who did he say was his bond officer?**

**A: Chad.**

**Q: Who did he say his attorney was?**

**A: Ken Sass.**

(Tr. at 307-308).

{¶61} In a later portion of testimony, Kelsie again referred to Perkins' status.

> Q [Prosecutor]: Now when you were talking to Detective Harvitt about what had happened to you, did you tell him who had done these things to you?
>
> A: I told him I didn't know. I just knew his first name.
>
> * * *
>
> Q: Did you tell him anything else about that person?
>
> A: I described him, what he looked like. Also what he had told me from the bar.
>
> Q: What was that?
>
> A: The details of like how he was in trouble. The lawyer[']s name and that.
>
> Q: Okay. Did you do anymore investigation on your own about who this person was?
>
> A: Yes.
>
> * * *
>
> Q: What did you do?
>
> A: I used Google. I put in the first name and Findlay, Ohio. And the charge that he told me he was in trouble for. Just clicked [G]oogle.

(Tr. at 324-325).

{¶62} Perkins' status was next mentioned in the testimony of Deputy Harvitt.

> **Q [Prosecutor]: How did you go about [attempting to contact Perkins]?**
>
> **A [Deputy Harvitt]: I tried to * * * contact * * * him through his probation. I couldn't get him to answer his phone.**
>
> **Q: You couldn't get who to answer the phone?**
>
> **A: Cory to answer his phone. I don't remember if it was either shut off or it went right to his voicemail. So I tried to go through his probation officer to try to relay some messages to get to him, or if he showed up to call me and I would go down and meet with him.**
>
> **Q: Did you have any success in making that contact through the probation officer?**
>
> **A: Eventually I did, yes.**
>
> **\* \* \***
>
> **Q: Prior to that meeting and to having to go through the probation officer, how many attempts did you make to contact Cory?**
>
> **A: I'm going to say probably a half a dozen.**

(Tr. at 574-576).

{¶63} Perkins' status was then brought up again during Joel's testimony in Perkins' defense. When Joel was being cross-examined by the State, the following testimony was elicited.

**Q [Prosecutor on cross]: Okay. Your brother you knew as being supervised at the time by the Adult Probation Department? He was on some type of bond status, is that correct?**

**A: I don't know, was he?**

**Q: I'm asking you the question.**

**A: I don't know.**

**\* \* \***

**Q: At the time your brother was being supervised by the Adult Probation Department on bond status – you're familiar with bond status first of all?**

**A: Yes, I am.**

**Q: At that time you knew your brother was on bond status?**

**[DEFENSE COUNSEL]: Your Honor, he's already asked and answered that question.**

**[COURT]: Overruled.**

**Q: You knew your brother was on bond?**

**A: No, I did not.**

**Q: You had no idea your brother was on bond at that time?**

**A: No, sir.**

**Q: You knew your brother was being represented by Ken Sass, an attorney, correct?**

**A: No, I did not.**

**Q: Okay. That was not something you ever discussed with your brother?**

**A: No.**

**Q: Are you familiar with Ken Sass, an attorney here in town?**

**A: Yes, I am.**

**Q: But you weren't aware that your brother was being represented by him at that time?**

**A: No, I did not.**

**Q: Did you know your brother had been charged?**

**A: With the case before this, yes.**

**Q: Okay. So you knew he had at least been charged?**

**A: Right.**

(Tr. 632-634).

**{¶64}** Perkins "bond" status also came up in closing arguments. In closing arguments, the prosecutor referred to Kelsie's identification of Perkins stating, "The Defendant * * * started talking about how he was on probation. On probation with Chad and Ken Sass was his attorney. That was information that she ultimately used to identify her attacker." (Tr. at 705). The prosecutor also referred to what Kelsie told Deputy Harvitt, stating,

> **She also gave the detective the information about the two men and one of them being on probation, having an attorney. Gave a physical description of the two men. And Detective Harvitt indicated that he had a chance and recognized that there is a**

**probation officer named Chad, a local attorney by the name of Mr. Ken Sass. He was later able to confirm the description that Kelsie had given to him as matching the Defendant and his brother Joel.**

(Tr. at 709).

**{¶65}** After the closing arguments, the court made the following limiting instruction with regard to the "bond" status and "other acts" testimony.

**Now evidence was received about the commission of crimes other than the offense with which the Defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character. If you find that the evidence of other crimes is true and that the Defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves the identity of the person who committed the offense in this trial. That evidence cannot be considered for any other purpose.**

(Tr. at 732).[6]

**{¶66}** On appeal, Perkins contends that the trial court erred by allowing the "other acts" testimony that he was out on bond. Perkins argues that the testimony was inadmissible and highly prejudicial, leaving the jury with the impression that Perkins was on probation for another crime.

**{¶67}** Perkins argues that identity was not an issue at trial, as Perkins stipulated that he had sex with the victim. Perkins also maintains that even if the

---

[6] Prior to closing arguments, the court had instructed the jury that closing arguments were not evidence. (Tr. at 699). The court made a similar instruction following the closing arguments. (Tr. at 731).

evidence was admissible under Evid.R. 404(b)[7] its probative value was substantially outweighed by the danger of unfair prejudice and thus it should have been excluded under Evid.R. 403.[8] Perkins does concede, however, that his trial attorney did not object to the "other acts" testimony at trial, leaving us with a plain error review.

**{¶68}** The State contends that the "other acts" testimony was necessary as it was one of the few pieces of information that Kelsie had known about Perkins and it was used to help both her and Deputy Harvitt separately identify Perkins. The State argues that Perkins' stipulation to his identity is irrelevant based on the Ohio Supreme Court's decision *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, and our own recent decision in *State v. Hansen*, 3d Dist. Seneca No. 13-12-42, 2013-Ohio-1735. The Ohio Supreme Court held in *Brown*, that

> **Evid.R. 404(B) clearly allows "other acts" evidence as proof of identity. *State v. Allen* (1995), 73 Ohio St.3d 626, 632, 653 N.E.2d 675. * * * Appellant asserts that identity was not at issue, since he had already admitted to killing one of the store clerks. Thus, appellant maintains that the "other acts" testimony was unnecessary to prove identity. This argument lacks merit. As**

---

[7] Evid.R. 404(B) reads,

> **(B) Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.**

[8] Evid.R. 403(A) reads, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

> **stated in *State v. McNeill* (1998), 83 Ohio St.3d 438, 442, 700 N.E.2d 596, need is irrelevant in determining the validity of an Evid.R. 404(B) objection. Moreover, the trial court minimized the likelihood of undue prejudice by giving limiting instructions to the jury to alert them to the narrow purpose of admitting such evidence. We consequently find that the trial court did not abuse its discretion in admitting this "other acts" testimony.**

*Brown* at ¶ 24.

{¶69} In *Hansen*, *supra*, we similarly held, "[t]he fact that Hansen wanted to stipulate to identity does not mean that the State had to accept the stipulation, nor does it mean that the trial court was required to exclude this otherwise probative evidence." *Hansen*, at ¶ 28 citing *State v. Collins,* 4th Dist. No. 1021, (Apr. 21, 1980).

{¶70} In this case, there were potential legitimate reasons for the State to introduce the "other acts" testimony. As argued by the State, the fact that Perkins said at the bar that he was "on bond" or "on felony probation" was used to determine his identity by Kelsie and by Deputy Harvitt. The information also could have been valid to show how Deputy Harvitt located Perkins. In addition, it could have been probative as corroborative of the facts of Kelsie's story.

{¶71} Despite the potential reasons for the evidence being admissible, we find the number of times that the "probation" evidence was referred to by the State, both in the testimony and in opening and closing arguments, was clearly excessive and as such constituted error. Nevertheless, similar to *Brown*, the jury was given a limiting instruction regarding the other acts testimony, and the jury is

presumed to have followed that instruction. *State v. Blevins*, 36 Ohio App.3d 147, 150, (10th Dist.1987), citing *Lakeside v. Oregon*, 435 U.S. 333, 340, 98 S.Ct. 1091, 1095 (1978). Thus, given that there is some legitimate purpose for introducing the evidence, and given that there was a limiting instruction that the jury was presumed to follow, we cannot find that its inclusion, or the erroneously excessive mention of this evidence by the State, rose to the level of plain error, particularly in the face of the overwhelming evidence of guilt. Accordingly, Perkins' second assignment of error is overruled.

*Fifth Assignment of Error*

{¶72} In Perkins' fifth assignment of error, Perkins argues that his trial counsel was ineffective. Specifically, Perkins contends that trial counsel called witnesses that were detrimental to Perkins' case, that trial counsel did not investigate the background of the witnesses thoroughly enough, that trial counsel did not object to prejudicial testimony and evidence, and that trial counsel allowed the testimony related to Perkins' bond status repeatedly without objection.

{¶73} "Reversal of convictions on ineffective assistance requires the defendant to show 'first that counsel's performance was deficient and, second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.'" *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751 at ¶105, quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052 (1984).

When considering a claim of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

{¶74} A tactical decision by trial counsel, who as a licensed attorney is presumed to be competent, is not by itself enough to show ineffective assistance of counsel simply because the strategy did not result in an acquittal. *State v. Clayton*, 62 Ohio St.2d 45, 48-49 (1980); *State v. Timm*, 3d Dist. Seneca No. 13-11-23, 2012-Ohio-410, ¶ 31. "Furthermore, trial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance." *State v. Turks*, 3d. Dist. Allen No. 1-08-44, 2009-Ohio-1837, ¶ 43, citing *State v. McKinney*, 11th Dist. Trumbull No. 2007-T-0004, 2008-Ohio-3256, ¶ 191; *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 103.

{¶75} On appeal, Perkins argues that his counsel was ineffective for multiple reasons. First, Perkins contends that his trial counsel was ineffective for calling Perkins' brother Joel as a witness. Perkins contends that Joel's testimony was more harmful than helpful, particularly in light of the fact that Joel had a prior sex offense, and prior felony convictions.

{¶76} Despite Perkins' arguments, Joel did testify that Kelsie and Desta approached Joel and Perkins at the bar, contradicting earlier testimony of Kelsie and Sayarath, and that Kelsie left willingly with Perkins at the end of the night.

Joel also testified that Kelsie was the one that asked for a ride home in the first place, potentially adding some credibility to Perkins' defense of consensual sex. Thus while Joel's criminal history might have painted him in a less than favorable light to the jury, his testimony did contradict in important respects some of the State's witnesses' testimony.

{¶77} Perkins next argues that his trial counsel was ineffective for failing to object to "extrinsic character evidence" when the State was cross-examining Joel and Breann Perkins. Perkins first points to a section where the State asked whether Joel had previously helped his brother in a bar fight. Joel repeatedly denies helping his brother. As Joel never admitted to being involved in that bar fight, it is unclear how counsel's failure to object would rise to the level of ineffective assistance as no damaging testimony was admitted by Joel.

{¶78} Perkins also points to his trial counsel's failure to object to the following exchange as ineffective:

**Q [Prosecutor on Cross]: You've never had to talk to a cop?**

**A [Joel Perkins]: No, I did not. Not on that, no, I have not.**

**Q: You've had to talk to cops on lots of occasions, correct?**

**A: Yes, sir.**

**Q: Okay. You don't really like talking to cops, do you?**

**A: It doesn't matter. They're people just like me.**

(Tr. at 636-637).

**{¶79}** Perkins argues that the State's questions were inflammatory and that his trial counsel should have objected. However, as can be seen, the questions asked by the State were reasonable follow-ups to Joel's initial response that he did not talk to a cop and therefore would have been admissible over any objection regardless. Perkins also contends that his counsel should have objected to the State's questioning regarding Joel's prior felony conviction for fleeing and grand theft without establishing how this would have been inadmissible.

**{¶80}** Perkins makes similar arguments that his counsel was ineffective for failing to object during the State's cross-examination of Breann Perkins. On cross, Breann testified that she had gotten a civil protection order against Perkins. The prosecutor then inquired into the specifics of the incident leading to the granting of the protection order. Breann denied some of the prosecutor's specifics and the prosecutor continued to question her credibility as Breann had testified on direct examination to Perkins' good character. Pursuant to Evid.R. 404(A)(1) the State was entitled to rebut the evidence of Perkins' good character on cross examination. On appeal Perkins cites no authority that the prosecutor's questioning was impermissible, merely arguing that Perkins' trial counsel should have objected because it was potentially damaging.

{¶81} Perkins next argues that his counsel was ineffective for failing to object to the evidence and issues associated with the first and second assignments of error. Having already determined that no reversible error was contained in those assignments, we cannot find counsel's failure to object was prejudicial or rose to the level of ineffective assistance of counsel.

{¶82} Perkins next contends that his trial counsel was ineffective for not admitting into evidence a "prior assault conviction" of Kelsie's husband David. However, Perkins' counsel argued to the trial court for the admissibility of David's prior misdemeanor convictions for assault and criminal damaging, but the court ruled that "it does not go to the truthfulness or veracity" and "relates to a specific instance of conduct." (Tr. at 403). The court then stated, "[y]ou can ask some further very limited questions to test his credibility, but I'm not going to let you go into the prior convictions, prior conduct[.]" (*Id.*) Based on our review of Evid.R. 609, the trial court properly ruled that the evidence could not be used to test David's credibility as the convictions (if there even were convictions) involved misdemeanors. Perkins cites no law to show us that the convictions should have otherwise been admissible, and thus we cannot find Perkins' trial counsel ineffective on this matter.

{¶83} Finally, Perkins broadly contends his counsel was ineffective for failing to "undertake reasonable investigations." Perkins cites as an example that

trial counsel should have called Perkins' treating cardiologist as an expert to avoid the issue of having Breann Perkins testify about specific instances of past sexual conduct. However, we have nothing in the record to establish what any cardiologist's testimony would be, and a cardiologist's testimony that Perkins was unable to perform sexual acts might have undermined Perkins' defense of consensual sexual activity. Thus the record is devoid of anything that would establish counsel was ineffective in his trial decision on this matter.

{¶84} In conclusion, Perkins has not demonstrated that his counsel was ineffective, and he has not demonstrated that he was deprived of a fair trial by any of his counsel's actions. Accordingly, Perkins' fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶85} In Perkins' sixth assignment of error, Perkins argues that the prosecutor engaged in "persistent and pervasive misconduct" thereby denying Perkins his right to a fair trial. Specifically, Perkins contends that the prosecutor elicited testimony in violation of Perkins' right to remain silent, that the prosecutor was hostile to Perkins' brother Joel when Joel was testifying, that the prosecutor made improper statements during closing arguments, and that the prosecutor improperly elicited testimony regarding Perkins' bond status.

{¶86} In reviewing claims of prosecutorial misconduct, the test is whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant. *State v. Jones*, 90 Ohio St.3d 403, 420 (2000). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id.,* quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982). Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2nd Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464 (1986).

{¶87} "Parties have wide latitude in their closing statements, particularly 'latitude as to what the evidence has shown and what inferences can be drawn from the evidence.'" *State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-7085, at ¶ 13, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, at ¶ 213. A prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, at ¶ 116.

{¶88} In arguing prosecutorial misconduct, Perkins first argues that the prosecutor improperly elicited testimony from Perkins regarding his right to counsel and to his right to remain silent. Having already found that there was no reversible error regarding this issue, we decline to further address this.

{¶89} Perkins next argues that the "prosecutor's dislike of Perkins' brother was so obvious the trial court ordered him to be more civil." This argument ignores the fact that it was both the prosecutor *and* Joel Perkins that were admonished to be more civil, and it is not clear whether either or both prompted this warning. (Tr. at 632-633). Nevertheless, there is nothing in the record to establish that there was any further incivility on the part of either the prosecutor or the witness, and there were no other instances of this in the trial.

{¶90} Perkins then argues that the prosecutor's closing argument contained multiple improper statements. Perkins contends that the prosecutor improperly "resurrected the argument that Perkins drugged Kelsie." The prosecutor is entitled to make reasonable inferences from the evidence, and Sayarath testified that she thought Kelsie was potentially drugged because Kelsie went from sober to highly intoxicated so quickly. Perkins argues that this was conclusively refuted by the SANE, but the SANE testified she did not test Kelsie for any drugs because Kelsie informed her she was highly intoxicated and could not remember some events from the evening. The prosecutor did not conclusively say Kelsie had been

drugged, he merely raised it as a possibility. We cannot find that making that inference based on the explicit testimony of a witness is improper.

{¶91} Perkins then revisits his arguments from the third assignment of error and the prosecutor's statements about venue during closing arguments. After reviewing the record, we find no error with the prosecutor's statements regarding venue.

{¶92} Next, Perkins argues that the prosecutor engaged in misconduct by "repeat[ing] certain questions even though the witness answered." Perkins points to no instances where the questioning was improper to rise to the level of misconduct, and we have not found any herein, so we cannot find that the prosecutor engaged in misconduct on this basis.

{¶93} Perkins also contends that the prosecutor presented extrinsic character evidence when Breann Perkins was on the stand. However, Perkins ignores the fact that Breann was asked about the good character of the accused on direct examination, making it proper under Evid.R. 404(A)(1) for the prosecutor to cross-examine her about the character of the accused to test her credibility.

{¶94} Perkins also takes issue with the prosecutor's references to the "bond" issue discussed in the second assignment of error. We have previously found some of those references to be excessive and erroneous. However, as there were also legitimate reasons for introducing this evidence, we again do not find it

to be reversible error or reversible misconduct on the part of the prosecutor. Notably, while the prosecutor did mention the "bond" issue several times, the prosecutor did not mention the actual criminal charge for which Perkins was "out on bond," illustrating that the prosecutor did at least comply to this extent with the court's ruling from the earlier hearing on the matter.

{¶95} In conclusion, after reviewing the record, Perkins is unable to establish that any misconduct materially altered the outcome of his trial. Accordingly, Perkins' sixth assignment of error is overruled.

{¶96} For the foregoing reasons, Perkins' assignments of error are overruled and the judgment of the Hancock County Common Pleas Court is affirmed.

***Judgment Affirmed***

**PRESTON, J., concurs.**

**/jlr**

**WILLAMOWSKI, P.J., Concurring Separately.**

{¶97} I concur with the judgment of the majority affirming the judgment of the trial court. However, I am writing separately as I would find that the trial court erred by excluding the testimony concerning the medical condition of the defendant pursuant to the R.C. 2907.02(D) as is set forth in the fourth assignment

of error. The portion of the statute in question, commonly referred to as the Rape

Shield Law, states as follows.

> **Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.**

R.C. 2907.02(D). The purpose of the Rape Shield Law is to prevent the use of a

victim's sexual history from being used against the victim and prevents the jury

from putting the victim on trial. See *State v. Williams*, 21 Ohio St.3d 33, 487

N.E.2d 560 (1986). In *Williams*, the Supreme Court of Ohio held that there

possibly could be situations in which the sexual history of one party with a third

party may be relevant and would be admissible in those situations. *Id*. at 35. The

Court held that in situations where the testimony affects more than the credibility

of a party, then it is admissible. *Id*. Additionally, this specific statutory section

prevents the use of a defendant's sexual history from being used by the

prosecution against the defendant. It does not and constitutionally should not

prevent the defendant from raising his or her own history.

{¶98} Here, Perkins sought to enter testimony from his estranged wife that

Perkins has serious heart issues which limited his ability to engage in sexual

activity of any kind and would have affected his ability to perform the acts for which Perkins was being tried. This issue is one of ability to commit the crime, not merely a question of credibility of the victim. Thus, pursuant to the holding in *Williams*, the evidence should have been admissible. The evidence should also have been admitted because the defendant has the right to waive the protection provided by the statute.

{¶99} Although I believe the evidence should have been admitted, I would not sustain the fourth assignment of error because I believe the error was harmless. There was substantial other evidence to indicate that Perkins had committed the acts for which he was tried. Thus, the outcome of the case was unlikely to change even if the evidence had been admitted. Therefore I concur in the judgment.